In re Jill T. **THOMPSON,** Debtor.

**Robert R. Helfrich, Plaintiff,**

**v.**

**Jill T. Thompson, Defendant.**

**Bankruptcy No. 98–56104.
Adversary No. 98–0375.**

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

June 18, 2001.

Mark Albert Herder, Columbus, OH, for plaintiff.

Charles D. Underwood, Whitehall, OH, for defendant/debtor.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT (AFTER REMAND)

BARBARA J. SELLERS, Bankruptcy Judge.

This matter is before the Court after remand by the Bankruptcy Appellate Panel of the Sixth Circuit ("BAP"). The remand requests factual findings underlying the Court's prior judgment in this dischargeability proceeding. Specifically, the BAP reversed that judgment to the extent it was based upon the preclusive effect of a state court magistrate's order. Although the parties at trial assumed the validity of the state court judgment and raised no issues about the amount of that judgment at the trial before this Court, the BAP determined on appeal that the magistrate's order was not a final judgment entitled to preclusive effect. Accordingly, the BAP requested this Court to make independent findings of the amount owed to the plaintiff by the defendant and the elements of embezzlement as they related to that debt. Consistent with that request, this Court makes the following findings of fact.

The Bankruptcy Court tried this adversary proceeding on two dates some months apart. Defendant's counsel had provided an incorrect or noncurrent address in his answer to the complaint and apparently did not receive notice of the first trial date of April 27, 1999. At that time only the plaintiff and his counsel appeared. After subsequent motion, the Court reopened evidence and reset the trial for December 13, 1999, to permit the defendant to introduce her evidence and to cross-examine the plaintiff.

Testimony on both dates established that a 20–year relationship existed between the plaintiff and the defendant, now a debtor in a bankruptcy case before this Court. That relationship included friendship, a landlord/tenant association and a period of romantic involvement.

In 1993 the plaintiff's wife sued him for divorce. The domestic relations court enjoined the plaintiff from using his bank accounts. He then sought help from the debtor. Specifically, in late 1993, the plaintiff asked the debtor to permit him to deposit funds received from tenants at his rental properties into the debtor's checking account. She then would write checks to pay the mortgage and other expenses related to his various rental properties. The propriety of this request and its effect upon the domestic relations case is not before this Court.

The plaintiff and the debtor continued this arrangement from late October 1993 until April 1995. Contemporaneously, the plaintiff agreed in writing to reduce the debtor's monthly rent by $250. That reduction never occurred, however. Apparently the plaintiff intended to use the writing to understate his income to the domestic relations court rather than to provide compensation to the debtor for use of her checking account.

Some months after the checking account arrangement began, the credit union where the debtor maintained her checking account began imposing a one to two week hold on the renters' checks the plaintiff was depositing before crediting those amounts to the debtor's account. In response to the potential for an insufficient funds problem created by the credit union's action, the plaintiff asserted that he deposited additional funds into the debtor's account to maintain a cushion. The plaintiff testified that he made two additional deposits in 1994 for that purpose. Those

deposits, totaling $7,786, were approximately what was required for one month's expenses. The debtor questioned that any "cushion" was deposited. She admitted the two deposits were made, but contended that the first deposit on January 10, 1994, for $3,486, predated the problems with the credit union and was just to cover the regular payments to mortgagees. She asserted that the second deposit, in the amount of $4,300 on July 14, 1999, included $2,000–$3,000 intended for her vacation to which the plaintiff had agreed to contribute. The remainder was intended for normal use in paying his bills.

In September of 1994 the plaintiff also entrusted to the debtor five cashier's checks drawn from his funds which another friend had been holding for him. There were four checks for $2,000 each and one for $2,733. The checks were payable to the debtor with the friend's name as remitter. The plaintiff testified that he asked the debtor to hold those checks in a sealed envelope until he instructed her to cash or deposit them. He claimed that no further instructions were ever given regarding those checks.

The debtor testified that the plaintiff told her she could use those checks for herself if she ever needed the funds. The debtor cashed the checks in October 1994, November 1994, December 1994 and April 1995. She stated that the first four checks were deposited into her credit union account at the plaintiff's request and were used for the payment of expenses related to his rental properties. She admitted that she cashed the final check in a different location and used the funds for her own needs. She testified that the plaintiff was aware at all times of each of these transactions.

In April 1995 the plaintiff's divorce proceeding concluded and the state court lifted all restraining orders against his accounts. The plaintiff subsequently requested the debtor to return the $7,786 "cushion" plus the $10,733 in cashier's checks. The debtor had just had a baby and initially delayed any response. When the plaintiff continued to ask and got no response, he testified that he ordered payments stopped on the cashier's checks. Only then, according to him, did he discover that those checks had been negotiated without his consent. He maintained that the debtor cashed the last check after he told her he no longer needed her assistance with his financial affairs. The debtor disputed this version of the events and maintained that the plaintiff knew of and instructed her to deposit the first four checks and that he knew when she cashed the final check. She also testified that at the time she cashed the final check, the plaintiff had not yet told her that his divorce was final.

The debtor never returned any of the $7,786 "float" or the $10,733 in cashier's checks. Nor was she able to document exactly how those funds were spent. The parties' arrangement did not involve any periodic accounting or reconciliation between his deposits and her check writing. The parties met periodically, at least once a month, at which time the plaintiff would endorse rent checks from his tenants sufficient to cover the checks the debtor had prepared for his expenses. The parties also met socially at other times. Until the credit union began to hold the tenants' checks for a period of time, the plaintiff testified that the amounts he or the debtor deposited were approximately equal to the amounts for which checks had been written. After the delay problem surfaced, the plaintiff asserted that the two additional deposits were made. It does not appear that the debtor was substantively involved in the details of the plaintiff's rental prop-

erty business. She was simply making her checking account available to the plaintiff on whatever basis and in whatever amounts he deemed necessary. Initially she wrote 10–15 checks monthly for the plaintiff. At first the amounts were $3,000 to $5,000 each month, but later those amounts increased.

At some point relations between the debtor and the plaintiff became strained. The debtor's boyfriend, now her husband, came to resent her interactions with the plaintiff, her meetings with him, and her willingness to make her account available to him. Some of that tension may explain certain inconsistencies in the debtor's testimony between the domestic relations action, where she was assisting the plaintiff, and this action, where the parties were clearly adverse.

It is difficult for this Court to determine, especially without any weight or preclusion being given to the results of the two-day jury trial in state court, whether the debtor or the plaintiff was lying. Did she intend to take his funds for her own use without his consent or did he merely use her services without requesting or requiring any accounting of the entrusted funds? Was he indifferent to the disposition of those funds so long as his essential bills were paid? There are inconsistencies in her testimony and there is evidence from the domestic relations suit that he is quite capable of misleading a court when it suits his purposes. Because neither party was challenging the state court proceedings, the trial before this court did not include a full accounting of all of the transactions in the debtor's account related to the plaintiff's expenses.

■ A complaint seeking to exclude a debt from operation of the bankruptcy discharge requires the plaintiff to prove by a preponderance of the evidence that the debt comes within the ambit of 11 U.S.C.

§ 523(a). *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). In this complaint subsections (a)(2) and (a)(4) of § 523(a) were the alleged grounds for the nondischargeability.

■ It was the (a)(4) ground of embezzlement which the plaintiff attempted to prove. Essentially, he assumed the validity of the state court order finding a debt of $18,519 plus interest arising from the debtor's conversion of his funds. Absent a final judgment from the state court proceeding, however, this Court cannot find that the plaintiff has met his burden of proof with regard to most of the questioned sums. Specifically, with regard to the $7,786 "cushion" and $8,000 in cashier's checks, the Court cannot find that the debtor converted or otherwise exercised inappropriate control over the plaintiff's funds. It was not the debtor's obligation to prove that her actions were nonfraudulent or not intended to cause harm. It was the plaintiff's burden to prove all elements required. For most of the transactions, the plaintiff did not meet his burden in this case.

■ The exception to this finding is the final cashier's check which the debtor deposited in April 1995. By that time the Court believes that whatever previous representations may or may not have been made, there was no consent on the plaintiff's part to the debtor's personal use of his funds. As to the final check cashed, in the amount of $2,733, the Court finds that the debtor intended to exercise control over the plaintiff's funds, without his consent, for her own benefit, and for a use other than that for which it was entrusted. Furthermore, as previously found by this Court on the BAP's prior limited remand, the circumstances surrounding the debtor's cashing of this final check indicated fraud. Pursuant to 11 U.S.C. § 523(a)(4),

that amount, then, is not dischargeable. *See Ball v. McDowell (In re McDowell),* 162 B.R. 136, 140 (Bankr.N.D.Ohio 1993).

Based on the foregoing, the debt of the debtor to the plaintiff in the amount of $2,733 is not discharged in her bankruptcy case. The remainder of any debt to the plaintiff is discharged. Judgment will be entered on a separate document.

**IT IS SO ORDERED.**

### *JUDGMENT ENTRY*

In accordance with the Findings of Fact and Conclusions of Law on Complaint to Determine Dischargeability of Debt (After Remand) entered this date, judgment is hereby entered in favor of the plaintiff and against the defendant/debtor in the amount of $2,733, and in favor of the defendant/debtor and against the plaintiff for all remaining sums.

**IT IS SO ORDERED.**